

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-2008

# USA v. Piper

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-4393

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Piper" (2008). *2008 Decisions.* Paper 960.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/960

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-4393

———

UNITED STATES OF AMERICA

v.

DEAN K. PIPER,
Appellant

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 01-cr-00478)
District Judge: Hon. Katharine S. Hayden

———

Submitted Under Third Circuit LAR 34.1(a)
June 24, 2008

Before: SLOVITER, BARRY and ROTH, Circuit Judges

(Filed: June 30, 2008)

———

OPINION

———

SLOVITER, Circuit Judge.

Defendant Dean K. Piper, who pled guilty to wire fraud, appeals the award of

restitution entered by the District Court, claiming that there was insufficient evidence to support $30,000 of the $295,000 restitution ordered.

## I.

Amitex was a purported financial institution located in the Bahamas. It ostensibly financed the purchase of tangible commodities solicited through telemarketing boiler rooms[1] located throughout the United States in exchange for various fees. Between late 1997 until March 1998 Piper owned and operated an Amitex boiler room named Franklin Asset Management Corporation ("FAMC") in Keyport, New Jersey. FAMC obtained a handful of customers, including Tom Beetstra. In March 1998, Piper created the World Bullion Exchange, which was a scam like FAMC. He used it to defraud Beetstra and another individual named Michael Bongo.

On July 20, 2001, Piper pled guilty to a one-count information charging him with wire fraud in violation of 18 U.S.C. § 1343. The parties entered into a plea agreement, in which Piper agreed to cooperate against other individuals involved in the scheme. The parties initially stipulated that the amount of loss attributable to Piper was more than $120,000 but less than $200,000. In the Pre-Sentence Investigation Report, the Probation Office calculated the loss attributable to Piper to be $265,300, to which the parties then

---

[1] The District Court explained, "when we say boilerroom, we're talking about salespeople, telemarketers in a room with phones selling investment opportunities to folks over the phone." App. at 44.

2

stipulated at sentencing.

Thereafter, the District Court heard testimony from Beetstra in which he testified that the stipulated amount did not include two additional $15,000 payments he had made to Piper. He provided no documentary evidence to substantiate the $30,000 loss. No corroborating evidence was found in Piper's records, even though he had provided his records regarding his fraudulent business, nor was there any corroboration in Piper's banking records that the government had seized.

Although Beetstra could not remember the date of the payments, he testified that he was "sure of the payment," App. at 32, because he stated that he had kept a written tally in his pocket. When asked by the Court if he currently had that piece of paper, Beetstra said, "No. I don't know if I did have one. I sent that to the government." App. at 37. There was some dispute whether the government had ever received such a tally. Beetstra, however, insisted that he made those payments:

> THE COURT: What makes you know for sure you made those payments?
>
> MR. BEETSTRA: I can recall the numbers. I can recall the numbers that I'm up to a quarter of a million; I am up to a quarter of a million I kept telling myself. I remember it being that high. I just know it was that high. I can recall now that the number was huge.

App. at 37.

Beetstra testified he had made those payments via wire transfer, but could not provide verification because his bank told him that it does not keep wire transfer records.

3

After Beetstra's testimony, the District Court gave Piper the opportunity to question Beetstra, but Piper's counsel declined to ask any questions or engage in any cross-examination.

The Court was evidently troubled in considering the amount of restitution to award. It commented as follows:

> THE COURT: The Court is presented with a somewhat difficult problem. And restitution is always difficult. Ultimately the Court is pretty much left to making a determination on its own.

App. at 40-41.

After additional colloquy, the Court stated,

> I am no different than a juror, one finally asks oneself if the proofs are not as crystal clear as everybody would like, particularly where we are talking about, I know I did, but I can't show you the pieces of paper, we say why would this person lie? And I really have to come down to why would Mr. Beetstra, in telling Mr. Barrett, this is what I lost, here's what I've got, why would Mr. Beetstra be saying in all candor, I know what I lost, and it's $222,300 and I made two $15,000 payments at times and I can not remember, but I know that I made them and I know they were $15,000. And quite frankly, it strikes me as credible testimony . . . [T]he absence of records is affecting both sides. It was a long time ago. It was eight years ago and more, and I am finding credible Mr. Beetstra's claim that the amount of loss, the amount of payment to Mr. Piper is an extra $30,000.

App. at 49.

After finding Beetstra's testimony to be credible, the Court increased Piper's restitution amount by $30,000. The final restitution order was for $295,300; $222,300 to

4

be paid to Beetstra and the balance to Bongo.

Piper does not dispute that $265,300 in loss was properly attributed to him for purposes of restitution. Rather, his appeal is limited to his claim that the additional $30,000 was not a proven loss, and that the District Court abused its discretion in finding that it was.[2]

## II.

Restitution is limited to the amount of actual loss suffered by the victims of a defendant's conduct. United States v. Vitillo, 490 F.3d 314, 330 (3d Cir. 2007). "The burden of demonstrating the amount of loss is on the government, and any dispute regarding the proper amount is to be resolved by a preponderance of the evidence." Id. (citing 18 U.S.C. § 3664(e)). We review the District Court's factual finding regarding the amount of loss for clear error. Id. (citing United States v. Akande, 200 F.3d 136, 138 (3d Cir. 1999)). To establish clear error in this case, Piper would have to show that the $30,000 addition to the restitution figure is "'completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.'" Id. (quoting United States v. Haut, 107 F.3d 213, 218 (3d Cir. 1997)).

Notwithstanding that the only evidence to prove the $30,000 loss is Beetstra's uncorroborated self-serving testimony, we cannot conclude that the District Court's

---

[2] We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

5

decision that the $30,000 constituted an additional loss is "completely devoid of a credible evidentiary basis." Id. (citation and internal quotations omitted). The District Court was in the best position to judge Beetstra's credibility. After all, the Court took the sworn testimony of Beetstra, and questioned him about the basis for his knowledge and why he had no supporting documentation. The Court gave both parties an opportunity to question Beetstra, which they declined. Although the evidence was not overwhelming, the District Court did not clearly err in determining the amount of loss. See Nara v. Frank, 488 F.3d 187, 201 (3d Cir. 2007) (stating that in "'doubtful cases'" district court's power of observation is often the most accurate way to ascertain the truth) (citation omitted).

### III.

For the above-stated reasons, we will affirm the judgment of conviction and sentence.[3]

---

[3] The government argues that we should review Piper's claim for plain error because he did not properly preserve his objection. Because of our ultimate disposition, it is not necessary to resolve that issue.