**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3405
_____

UNITED STATES OF AMERICA,


v.


JOHN A. BENNETT,
Appellant
___

On Appeal from the United States District Court
for the District of New Jersey
(2-09-cr-00656-002)
District Judge:  The Honorable Susan D. Wigenton
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 16, 2016

Before:  AMBRO, CHAGARES, and FUENTES, *Circuit Judges*

(Opinion Filed: April 28, 2017)
_____

OPINION*
_____

FUENTES, *Circuit Judge*.

Following a three-week jury trial, the defendant John Bennett was convicted of

fraud and conspiracy offenses in connection with a scheme to pay kickbacks and defraud

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

the U.S. Government. The crimes related to cleanup efforts at a Superfund site in New Jersey funded by the Environmental Protection Agency (EPA) and supervised by the U.S. Army Corps of Engineers. Bennett was subsequently sentenced to 63 months in prison and fines and restitution amounting to just over $3.8 million.

Bennett appeals his conviction and sentence,[1] raising eight issues on appeal: (1) whether the government failed to offer evidence that Bennett made or knew of any material misrepresentation or acted with fraudulent intent, or intentionally paid kickbacks to obtain favorable treatment; (2) whether the District Court violated Federal Rule of Evidence 701 by permitting, over Bennett's objections, a lay witness for the government, an Army Corps employee, to testify about the Anti-Kickback Act, that the benefits that BEI provided to the primary contractor were kickbacks, and that she would expect subcontractors like BEI to know this; (3) whether the District Court erred in admitting, over Bennett's objections, telephone records without live witnesses to authenticate them; (4) whether the government's remarks in closing that "[y]ou cannot come into this country, get a Government funded project, and conveniently fail to pay attention to rules that apply"[2] encouraged the jury to find Bennett guilty because he is a foreigner; (5) whether the District Court's jury instructions on the Anti-Kickback Act[3] were overly

---

[1] The District Court had subject matter jurisdiction under 18 § U.S.C. 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

[2] JA-830.

[3] The District Court instructed the jury that "a kickback means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee, to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract. It is not

2

broad in light of the Supreme Court's recent decision in *McDonnell v. United States*,[4] interpreting a different term in a different statute, because it reflected too broad an understanding of *quid pro quo*, including incidental favors not intended to influence the official receiving them; (6) whether the cumulative effects of these errors require reversal; (7) whether Bennett's sentence is procedurally[5] and substantively unreasonable; and (8) whether the District Court improperly calculated restitution.

We have carefully reviewed the record on appeal and conclude that the issues raised are without merit, with the possible exception of Bennett's sufficiency-of-the-evidence and restitution arguments. We review these challenges in turn below. Ultimately, we conclude that these challenges are also without merit, and thus we will affirm.

**I.**

We write principally for the parties in this case, and thus briefly summarize the relevant facts. Bennett was charged as part of a scheme to pay kickbacks and defraud the government in connection with environmental cleanup efforts at the Federal Creosote Superfund site in Manville, New Jersey, where the soil had been infected with creosote waste. Such efforts were funded by the EPA and overseen by the U.S. Army Corps of Engineers, which in turn hired Sevenson Environmental Services as the primary

---

enough to find that the defendant gave something of value to build general good will." JA-812-13.

[4] 136 S. Ct. 2355 (2016).

[5] Bennett objects to the application of a four-level aggravating enhancement on the basis that he was an organizer or leader of the criminal scheme; he argues that the government only showed he was a leader of BEI and not of the scheme.

3

contractor for the site. Sevenson's project manager on the site was Gordon McDonald, whose responsibilities included the hiring of subcontractors. One of the subcontractors McDonald hired was BEI to treat and dispose of soil; Bennett served as BEI's chairman and CEO. Robert Griffiths served as a salesperson and BEI's primary contact with Sevenson and McDonald. Zul Tejpar served as vice president of BEI.[6]

McDonald entered into conspiracies with at least three subcontractors at the Federal Creosote and another toxic waste site in New Jersey, including BEI. McDonald and these subcontractors manipulated the bidding process by sharing information about rivals' bids and coordinating bids, so that the subcontractors could win their contracts at inflated prices. In exchange, the subcontractors, including BEI, gave McDonald and other Sevenson employees gifts such as money, a hockey game, a Mediterranean cruise, a plasma television, and a wine cooler.

Cleanup work began in 2000 and proceeded in three phases. BEI won a bid in 2000 for soil decontamination work in Phase I; the government did not allege that BEI paid any kickbacks at this phase. However, the government did allege that BEI did pay kickbacks in order to win the Phase II contract in 2002. Specifically, Griffiths testified that McDonald told him that BEI was not the lowest bidder and then asked for a kickback, and that Griffiths reported this proposal to Bennett, Tejpar, and others. During a meeting at the sports bar of the Ramada Hotel in Manville, McDonald and Griffiths agreed to a kickback of $13.50 per ton of soil shipped to BEI, in exchange for which BEI would be permitted to submit another bid as well as get a "last look" on the other bids

---

[6] Both Griffiths and Tejpar pleaded guilty and testified against Bennett at trial.

submitted. After agreeing to this proposal, BEI submitted a new bid and won the subcontract.

Griffiths also testified that BEI continued to pay kickbacks to McDonald for the 2003 Phase III subcontract bidding. McDonald showed Griffiths other subcontractors' bids and BEI again won the bid. However, a losing bidder protested the bid, and the sub-contract was re-bid in December 2003. The re-bidding was intended to be a sealed process in which bids were opened simultaneously in a ceremonial public opening. To get around these protections, Griffiths prepared around 150 pricing sheets, each one with a different bid, which he gave to McDonald. Before the public ceremony, McDonald secretly checked a competitor's bid to communicate it to Griffiths and ask Griffiths which bidding sheet to bid. Griffiths testified that he then conferred with Bennett to submit a bid allowing BEI to win the subcontract within a dollar or two per ton of the lowest bid.

During this time, Griffiths used 30% of the $13.50 per ton kickback as an "entertainment fund" to give gifts to Sevenson employees. Griffiths testified that Bennett approved these expenses. Griffiths also paid kickbacks, totaling roughly $1 million, to a shell company, General Monitoring or GMEC, owned by McDonald, and testified that Bennett was aware that these payments were part of the kickback scheme.

After his conviction, Bennett moved for acquittal on all counts under Federal Rule of Civil Procedure 29 or for a new trial under Federal Rule of Civil Procedure 33. The District Court denied these motions from the bench.

**II.**

5

"We exercise plenary review over a district court's denial of a motion for judgment of acquittal based on the sufficiency of the evidence."[7] "The verdict must be sustained if 'any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'"[8] In making this determination, we consider the evidence in the light most favorable to the government.[9] Thus, "[t] he burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high."[10]

Bennett makes two arguments. First, he argues that the government failed to prove its case as to both counts[11] because it failed to prove that he knew of any material falsehoods. Second, Bennett argues that, as to Count 2,[12] the government failed to prove that Bennett acted with specific intent to defraud the government.[13]

As to Bennett's first argument, the government contends that Bennett made material misrepresentations in the July 8, 2002 Phase II purchase order signed by

---

[7] *United States v. Berrios*, 676 F.3d 118, 132 (3d Cir. 2012).

[8] *Id.* (quoting *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008)). *See also United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) ("A verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.")).

[9] *United States v. Lore*, 430 F.3d 190, 204 (3d Cir. 2005).

[10] *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008).

[11] Bennett was convicted of (1) participating in a conspiracy in violation of 18 U.S.C. § 371 with the objective to provide kickbacks to a prime contractor to improperly obtain favorable treatment in violation of 41 U.S.C. §§ 53-54 and to commit major fraud against the EPA in violation of 18 U.S.C. § 1031 (kickback and fraud conspiracy) and (2) committing major fraud against the United States in violation of 18 U.S.C. § 1031(a).

[12] Count 2, the major fraud statute, makes it a crime to "knowingly execute[], or attempt[] to execute, any scheme or artifice with the intent (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises" in connection with federal contracts worth $1,000,000 or more. 18 U.S.C. § 1031. The government must prove that this falsehood is material. *Neder v. United States*, 527 U.S. 1, 25 (1999) (mail, bank, and wire fraud statutes).

[13] *See* Bennett's Brief at 30-44 (discussing both arguments).

Griffiths on behalf of BEI and the subsequent change orders. These orders represented that BEI would work "in strict compliance with the principal contract documents."[14] These documents in turn contained agreements not to violate the Anti-Kickback Act.

Bennett argues that the government failed to prove at trial that he had seen these principal contract documents or was aware of these representations. In response, the government points to testimony by Army Corps witness Mari Shannon that contractors are required to tell subcontractors like BEI the terms of the principal contract documents, and testimony by Griffiths that "[w]e were given a booklet of representations and certifications" that included an explanation of the Anti-Kickback Act.[15] Furthermore, the government points to Griffiths' testimony that he knew he was not in strict compliance with the prime contract and that he conferred with Bennett on the bid pricing. From this, the government argues that the jury could have inferred that Bennett knew the representation was false. This testimony was sufficient for the jury to conclude that Bennett made a material misrepresentation.

Second, Bennett argues that the Court should enter a judgment of acquittal as to Count 2 because the government failed to show that Bennett acted with specific intent to defraud the government. He argues that the evidence showed that BEI's Phase II bid remained identical at $498.50 per ton before and after any alleged kickbacks were paid, and thus he had no intent to harm the EPA. Thus, "[s]peculation that the absence of a

---

[14] *See* JA-895.

[15] SA-35 ("Q When you entered into contracts at Federal Creosote, were you provided with a copy of the Anti-kickback Act? A Yes. Or relevant sections in it. We were given a booklet of representations and certifications, and either this or parts of this was included in it. But I do specifically remember this in there.").

7

kickback would have translated into a lower bid price is insufficient as a matter of law to establish fraudulent intent, since a kickback may be paid out of a bidder's own profit rather than from the government's pocket."[16] The government responds by pointing to testimony by Griffiths and Tejpar that the cost of the kickback was added to overcharge the EPA.[17] The government explains that

> BEI was able to add the $13.50 kickback without changing its overall bid price because McDonald's manipulations of the bidding process forced other competitors to *raise* their new bids. For example, McDonald made the contamination look as severe as possible to pressure rival bidders to bid higher. Griffiths explained that McDonald's manipulations were intended to get [the] competition to raise their prices. The EPA was harmed because, had the kickback not been added, BEI's winning bid would have been $13.50 per ton lower.[18]

Thus, the District Court properly found that the jury was entitled to credit the government's evidence that the second bid included the cost of the kickback.

### III.

Bennett contends that the District Court improperly calculated restitution. "We exercise plenary review over the determination that restitution was lawful, and review the amount awarded for clear error."[19] The District Court adopted the recommendation of the presentence report as to restitution, which in turn had adopted the government's calculation of the EPA's loss of $3,808,065.72. This reflects three separate losses: (1) a

---

[16] Bennett's Brief at 39.

[17] Gov't's Brief at 35 (citing A-184 (testimony of Griffiths that the bid "included a 13.50 increase from our original pricing . . . of kickback"); SA-120 (testimony of Tejpar) ("A: Rob was able to increase our price because of last look. So he was able to increase it by $13.50, and he was going to share part of that extra increase with Sevenson and ourselves and entertainment.").

[18] Gov't Brief at 36 (internal citations and quotations removed).

[19] *Akande*, 200 F.3d at 138 (citing *United States v. Jacobs,* 167 F.3d 792, 795 (3d Cir. 1999)).

loss of $13.50 per ton, which reflected a kickback to the primary contractor on the Phase II contract; (2) a loss of $80 per ton in inflated facility costs on the Phase II contract; and (3) a loss of $101 per ton, reflecting the difference between the lowest bid and winning bid that BEI fraudulently submitted to win the Phase III contract.

In his appeal, Bennett opposes this restitution calculation on substantive and procedural grounds. He argues that the District Court committed procedural error by imposing restitution without "explaining how the amount of . . . restitution imposed was related to any loss caused by the conduct underlying the . . . offenses" for which Bennett was found guilty.[20] He further argues that these categories of restitution award are substantively improper: As to the first category, Bennett argues that because BEI's bid did not change before and after the kickback, the kickback came out of BEI's profits and did not cause any loss to the EPA. As to the second category, Bennett argues that the inflated facility cost conduct was not charged, and therefore cannot be included in the restitution.[21] Furthermore, he argues that it did not cause any loss to the EPA. As to the third category, Bennett argues that again no loss was caused to the EPA, because BEI submitted the lowest bid in the bidding process.

---

[20] *United States v. Furst*, 918 F.2d 400, 410 (3d Cir. 1990). *See also Akande*, 200 F.3d at 143 ("Although judges normally may use any information they possess to enhance a sentence, restitution is a special case, because the statutes limit restitution to the losses caused by the offense of conviction. Accordingly, because we look only to the specific conduct supporting the offense of conviction, the mere fact that the November events may be factua[lly] connect[ed] to the later conspiracy does not make them legally relevant.") (internal citations and quotations omitted).
[21] Bennett's Brief at 85 (citing *United States v. Munchak*, 527 F. App'x 191, 197-98 (3d Cir. 2013)).

In imposing the restitution award at sentencing, the District Court appeared to consider these arguments. The District Court explained that

> [t]here was finally an argument as it relates to the restitution amount that's being sought and has been outlined by the Government as it relates to the Environmental Protection Agency. As indicated, there's been nothing to contest what the number is. The Government has provided significant documentation not only during the course of its submissions relating to sentencing but also during the course of the trial. There were numerous documents and there's extensive evidence as it related to the amount of money that was in fact -- that the EPA in fact was required to pay and would not have been required to pay.[22]

The District Court then imposed the full restitution included in the presentence report and requested by the government.

Bennett is correct in stating that restitution can only be imposed based on conduct that is the basis for the conviction[23] and that, once the Defendant disputes a basis of the restitution award included in the presentence report, the District Court must make specific factual findings as to those disputed facts and whether it will rely on those disputed facts.[24] The District Court found that Bennett did not provide enough information in his sentencing memorandum to actually dispute the basis of the restitution award and thus imposed the full restitution award. Unfortunately, Bennett has not provided us with his sentencing memorandum from which we could evaluate whether the District Court committed clear error in imposing this restitution award, and this memorandum is not available on the District Court's docket. As such, we must affirm the restitution award.

---

[22] Sentencing Transcript at 60.
[23] *Akande*, 200 F.3d at 138–39.
[24] *Furst*, 918 F.2d at 406 (citing Fed. R. Crim. P. 32(c)(3)(D)).

## IV.

For the foregoing reasons, we will affirm.